Next case is Cranbury Brickyard, LLC v. United States. Mr. McGarrett. Good morning, Your Honor. May it please the Court, John McGarrett on behalf of Cranbury Brickyard. Your Honor, this case involves the redevelopment of a property in Cranbury, New Jersey, right around exit 8A on the New Jersey Turnpike, which has become a corridor for the internet retail economy and has resulted in redevelopment of a lot of sites. This particular site was used historically by the United States for the production of munitions during World War II and the Korean War, and it was utilized for that purpose until 1954 when a massive explosion occurred at the site and munitions were spread all across the property. The site was shut down and lay fallow for many years until a subsequent owner of the property, Cranbury Development Corporation, decided to redevelop the property and entered into discussions with the New Jersey Department of Environmental Protection to oversee the cleanup. That initiated an enforcement action by the DEP, which resulted in the issuance of a directive, which is akin to a unilateral order under CERCLA, for three liable parties to perform the cleanup. Initially, it was thought... I'm sorry to cut you off, but you can assume we've read everything. So, question, do you, in your view, is 107 and 113 mutually exclusive? No, Your Honor, I believe the Supreme Court has addressed that issue in the Atlantic Research Decision. Right, they're complementary, but what does that mean practically for our purposes? They're complementary and overlapping, according to the Supreme Court, Your Honor, and the court needs to look at the specifics of the situation in order to determine which remedy is appropriate. In this case, we're dealing with a non-liable party. Congress amended the CERCLA statute only for the second time in 2002. Who are the liable parties? The liable parties include the United States, Cranberry Development Corporation, and MAXAM. All right, and your client stepped right into the shoes of CDC, right? This language from the ACO amendment is pretty clear, step into the shoes language. It says that you replace Credit Agricole Asset Management and Cranberry Development Corporation with, replace with Cranberry Brickyard LLC as respondents. So you're, that makes you a liable party under the agreement, right? No, Your Honor, it doesn't change the status of my client, Cranberry Brickyard. My client is a bona fide prospective person. That's a separate, that's a different issue. That's a, if you went on BFPP, fine, you're all set, but we need to deal with these other issues first. I mean, and you pled this in response to the government's counterclaim, I think. I think you raised this agreement as a potential defense to your liability to them. So you're relying on the benefits of an agreement that said that CDC, now Cranberry Brick, would have no further liability. So that sounds like it plugs into our decision in AGEAR, which you said Atlantic Research left this open, but our decision in AGEAR said you, you know, 107 and 113 don't overlap here, right? You don't have a 107 claim. Yours is a, you know, because you've settled out with the, I understand you don't think that this is a settlement. You dispute that it's a settlement, but you've pled it as something that protects you from liability. So how can, how can you have a 107 claim left? Your Honor, again, I refer to 107 R1, which provides specifically that an entity like my client is exempt from circle liability and is not liable. AGEAR addresses parties that were all liable parties, either as owner operators or arrangers for disposal at that particular site. And again, the BFPP status was instituted by Congress to promote parties like my client to come in and take over cleanups of properties of brownfields so that they can be put back into productive use. It's specifically an exemption from liability. So by entering into the ACL, my party didn't, my client didn't create liability. It took over an obligation to satisfy the cleanup requirements. If it didn't take over liability, why was it paid $1.85 million? I mean, in your experience, when people buy, this is a several hundred acre parcel in a valuable location, right? It has become a valuable location, yes, Your Honor. And wasn't your client paid? Your client's the buyer of the property. Correct, Your Honor. And it was, it didn't pay money to buy the property. It was paid $1.85 million, was it not? Actually, it paid $5.5 million, Your Honor, to buy the property. And it assumed the cleanup obligations of the seller, Cranberry Development Corporation. There was already an ACL in place with both Cranberry Development Corporation and Maxam. It was a contractual… It wasn't paid $1.85 million? Yes, Your Honor, it was paid that amount because it incurred those costs. Yeah, so when a buyer buys land and gets paid money to buy the land, it seems pretty obvious, unless the seller is dispossessed of all rationality, that the seller is handing off a liability and they knew what they were getting into, which was this was a site that was going to require environmental remediation, correct? Your Honor, I… Or am I, it just seems pretty obvious. What am I missing? Well, the fact that my client paid to purchase this site, it was paid $1.8 million in order to be reimbursed for cleanup obligations that had taken on by another responsible party, not by the seller of the property. The purpose of creating this exemption from liability is to create a 107 claim on behalf of a BFPP, which is a very much more potent claim and incentive to a party to take on cleanup like this because… If it's a settlement that says this is an administrative settlement, then it's a 113 claim. In order to take on a cleanup in the state of New Jersey, you have to enter into an oversight document with the New Jersey Department of Environmental Protection. It's a matter of state law. So my client entered into that oversight document in order to satisfy state law and to obtain the oversight of DEP, and that ensured that the cleanup was done in a proper fashion. And you pled that in response to the USA's counterclaims as a defense to liability, the United States. You pled that you had this agreement. You were using it as a settlement, as a shield. And so you don't have a… Since you're using this as a settlement, you have a 113 is where you are. You don't have 107 claims left under a guarantee. I think, Your Honor, you're referring to the concern that has been expressed by courts that you would vitiate the contribution claim and the right of other parties to allocate the costs. Right. In this case, my client has no liability because they satisfy the BFPP requirement. This is being hotly disputed whether your client has liability, and he's using this as a shield. Even R1 speaks of potential liability. Yes, Your Honor. Why isn't this a settlement? You pled it as a shield. You are now in the realm of 113. You are not in the realm of 107 anymore. I understand your position is you… BFPP means that any liability goes away, but even R1 speaks of potential liability, and this is a shield against that liability. Well, Your Honor, the Supreme Court in Atlantic Research in footnotes 6 specifically said that a party that voluntarily cleans up a property can only recover their costs under 107A4B. This is that precise situation. My client was a volunteer, essentially a brownfield redevelopment company, that came in, paid money to buy a site, took over the cleanup obligations of the responsible parties. This was all done voluntarily, and this is what Congress intended in establishing the BFPP status in order to promote development… I'm a little confused, counsel. You seem to be linking the BFPP status with your argument that you're entitled to 107 treatment. I thought your BFPP status was a fallback argument or that even if we disagree with you and apply 113 and not 107, you still prevail because of BFPP status. Is that correct? I think the fallback argument, Your Honor, is that if we're relegated to a contribution claim on the 113G3, that the statute of limitations has not run. Well, let's assume we're against you on that, too. Do you still get BFPP status, or is BFPP status somehow linked to your arguments on the 113 claim? I think that Atlantic Research says that even a PRP, a responsible party, can recover under Section 107A4. No, let me try that again. Assume that we disagree with you. You're continuing to vigorously press the 107 argument. Just assume for the sake of this question that we disagree with you on that. Assume that you're limited to 113, and we think the action's time-barred under the statute of limitations. But let's assume we agree with you that BFPP status is still alive because the district court erred on the disposal issue. Could you tell us what happens then, or are you without a remedy then? Is it that important for you to win on the 107 argument? Or do you have another way to win, namely BFPP status? I think it's critical that this court identify and recognize that my client has BFPP status, because that determines liability of my client. And if there is no liability of my client, there's no liability to settle. Let's talk about BFPP status specifically. Your brief focuses on the puncturing of the tank. Let's grant that the puncturing of the tank itself is a release but not a disposal. But you did a lot more than just the puncturing of the tank. There's the mixing with the soil. There's redepositing it. There's the seven-acre landfill with the asbestos, aluminum, and barium. There's barrels of white goo that don't get disposed of properly. There's munitions, explosive concerns that get left uncovered. I mean, the government's brief at pages 45, 44, 45, 46 goes through this in depth. So your liability here is not – BFPP is not just about the puncturing of the tank. Why isn't the fact that you – some of those things you left uncovered, some of them you redeposited in the soil, some of them you moved around, why don't they just knock you out of BFPP status? Because those look more – less like just some kind of accidental release and more like the active – you know, the placing, the depositing of soil that doesn't belong there once it's contaminated. Your Honor, the government of the liable parties had an opportunity to participate in this cleanup this Monday morning quarterbacking what happened and is pointing at incidents that they claim defeats BFPP status because there were disposals at the site or we didn't exercise appropriate care. Here, this entire cleanup was overseen by the New Jersey Department of Environmental Protection. The cleanup is preceded according to the plans approved. Even the instance of the 20-gallon release, Your Honor, those materials were – delivered to the DEP immediately by the contractor. The client responded to the release. It screened the materials to remove any potential – any potential munitions. And then, Your Honor, the material was placed in a manner – disposal – all cleanups or many cleanups, Your Honor, would involve disposal if on-site consolidation of materials under a cap defeated the status of BFPP. Pardon me, Your Honor. No, no. I beg your pardon. The issue is more than just whether New Jersey DEP approved it. I mean, the judge has put a question to you. Your response is, you know, but it was approved. We did this and this. But the question is, what about all of the things that were just enumerated that go beyond that? That's the issue. All of those things were addressed, Your Honor. And when you're doing a cleanup of the site, you don't know what's in the ground. You can do borings and wells, and you can try and determine what – but until you actually start digging, the contractor puts the backhoe into the ground and starts digging, you don't know what you're going to hit. In this case, the contractor hit a UST, and it responded appropriately. That all-disposal requirement has to be read in harmony with all the other requirements which deal with due care, with notifying agencies, with cooperation, with providing access to the agency to oversee the cleanup. All of these things were done by the client in the course of this very successful cleanup. Counselor, I know you're over time, but you've just given us some articulate arguments as to why you were working hand-in-glove with NJDEP. Unfortunately, they're not in your brief. Your brief is all about whether reintroducing the contaminated soil was a – whether the deal in the contaminated soil was a disposal at all. So it seems to me that that regulatory compliance is a defense or something is forfeited. Why should we consider it when you're raising it for the first time at oral argument? Well, the court, Your Honor, below, focused on the all-disposal requirements. That's what we focused on primarily in our brief. We did address the responses of the client to that action. Could you please tell me, is there any place in your briefing where you have preserved this argument before our court? I didn't find it. I believe it's in the reply brief where we address those arguments. Please tell me where. I believe it's in the opening brief, Your Honor. Where? Okay. We addressed it on page 10 and 11 of our reply brief, Your Honor. It's also addressed in the opening brief, the all-disposal requirement. Page 19, 18 and 19. I believe, Your Honor, we did address this. And it was also addressed below. It was part of the court's decision. It was part of the summary judgment briefing. It was addressed in the undisputed findings of fact that we attached to the record here, et cetera. But if you're right on disposal, remand is required anyway because the district judge never got to the other three requirements that the government claimed were not met, right? I believe that's correct, Your Honor. Okay. All right. You reserved five minutes, I think, for rebuttal? Yes, Your Honor. Okay. We'll hear you on rebuttal, Mr. McGarrett. Thank you. Let's hear from Mr. Kupfer. One second. Could you, while you're sitting down, just look to your reply brief on the point that you just made to Judge Bevis? That would be helpful on rebuttal. Thank you. Good morning. May it please the Court. Avi Kupfer for the Federal Appellees. I'd like to begin with a question that Judge Hardiman posed regarding BFPP status. This Court need not reach the question CBY's alleged status as a BFPP because this is a statute of limitations case. Under either potentially applicable statute of limitations, CBY's contribution action, which was filed more than nine years after that right accrued, is untimely. The only material issue is whether CBY entered into the administrative consent order, an order that even CBY acknowledges is an administrative settlement under CERCLA. If this Court agrees with the United States that CBY entered into that order, it is unnecessary to reach the BFPP issue because that issue only arises with respect to the United States contribution counterclaim. Ah, I see. Now I understand why he was fighting so hard on 107. So really the whole ballgame here is 107 versus 113 and timeliness. That's right. Because CBY's liability is only relevant to the United States contribution counterclaim to their cost recovery action. And a cost recovery action is unavailable to a party in CBY's shoes that has settled its liability with the state. Well, if we're looking at 113, if we're looking at contribution, tell me why I think it's pronounced Garrity. Garrity from the Fifth Circuit and Sun from the Tenth Circuit shouldn't govern in the way we think about the six-year statute of limitations. Well, as the Sixth Circuit explained in Hobart, those two cases were decided before the Supreme Court decided Atlantic Research and before the Supreme Court decided Cooper Industries. And those cases made clear a point that the circuits had disagreed on, which was whether 107A and 113F both provide separate causes of action. Those two cases had said that 113F actions are actually a subset of 107A actions. The Supreme Court explained in those two cases that, no, these are separate causes of actions available to plaintiffs in different procedural circumstances. Counsel is correct that footnote six of Atlantic Research did leave open the possibility that there are potential circumstances where 107A and 113 could overlap. But as every court of appeals since Atlantic Research has explained, they don't overlap in the situation here. When a party like CBY enters into an administrative settlement, when that occurs, only the 113F3B cause of action is available. This court squarely decided that issue in a gear. Mr. Kupfer, I'm. Go ahead. So when does the statute of limitations begin? The statute of limit as 113F3B, the cause of action, explains when a party has settled its liability to a state, its right accrues. So we've got to go back to January of 06. February of 06, yes. What's a little vexing about that is 113G3B refers to judicially approved settlements but doesn't say anything about administrative settlements. There appears to be a gap in the statute. Is there not? It refers to certain types of administrative settlements as triggering events, not this type of administrative settlement. And our position is that this court doesn't need to resolve that difficult question of CERCLA interpreted law because, and as many courts have noted, CERCLA is not a model of clarity. But this isn't the case where you need to decide that question because under either potentially applicable statute of limitations, either the special statute of limitations that Congress created for contribution actions under CERCLA or the residual statute of limitations applicable by default in every civil action, with exception inapplicable here, against the United States, this contribution action is untimely. Okay. So that would resolve it for the U.S. government. Then it would be for another case. But is the government's position if we decide the issue that we should be borrowing the six-year statute of limitations, even though it's traditionally this is the closest analog? No. So this is where this case is different than Hobart in the Sixth Circuit. That was a case between two private parties. The Sixth Circuit looked to the borrowing doctrine because there was a void in the federal statutory law. In a civil action where the United States is a defendant, there is never a void in the federal statutory law. So the borrowing doctrine doesn't apply. In a case against the U.S. government. So we could rest on that ground. But if we wanted to rule in a way that would resolve this for private parties going forward as well, would that be the right course? I can't speak to that issue because in this case here, we didn't brief the issue of the borrowing doctrine because it's never applicable against the United States. You can see that we have filed amicus briefs in that Sixth Circuit case, Hobart, in Niagara-Moac, the Second Circuit case where the United States position was that it was appropriate to use the borrowing doctrine in the way that the Sixth Circuit did in a case between private parties. To our amicus briefs in those cases. Again, though, our position is that that's a difficult question. We had some textual support on our side. We readily admit that this type of administrative settlement is not one of the enumerated triggering events, although G3 does say it is the statute of limitations and contribution action. But this would be a different case if CDY had filed its action four and a half years after its right accrued. It didn't do that. It sat on its right for nine years, and Congress has partially waived the government's sovereign immunity in these types of cases. But it still has set a six-year statute of limitations. I'll ask Mr. McGarrett this, but does the government have any insight as to why nine years passed before this happened? I've never seen a case where so much time elapsed. We don't have any insight to it. It's especially odd here because Maxim, the successor in interest to the owner at the time that hazardous materials were introduced to the site, immediately filed an action against the United States after it entered into the administrative consent order with New Jersey, and CBY was deposed in that case in 2006. Well, and that case was settled? That case was settled, and that settlement's in the record in this case. Can you help me with disposal? I really have struggled with trying to work with these definitions because release refers to disposing into the environment. It seems extremely not only inequitable but quite inconsistent with the whole concept of the Brownfield Amendments to treat Mr. McGarrett's client as a disposer when it's understood that as the remediator, they're going to come to the site and start digging stuff up. If digging stuff up can be disposal, how could they possibly satisfy the appropriate care requirement? Help me out with that. Your Honor, I'm going to answer that question, but first I would like to reiterate that there's absolutely no need to reach the question of their alleged BFPP status in this case because it's only relevant to the encounter. I heard you when you said that. All right. But to answer your question, as Mr. McGarrett stated just a moment ago, you don't know what's in the ground when you're a developer. That's why CERCLA has set up a system of incentives for developers to settle. You can either take the assurance of a settlement with the state, and CERCLA incentivizes potential developers to settle because it means that cleanup happens more quickly, brings the parties to the bargaining table and then to the cleanup table, as this Court has noted several times. Or you can take that assurance, or you can proceed under the uncertainty that no disposal, which is a very broad term, as this Court has noted and as every other court of appeals to consider the issue has noted, you can proceed under that uncertainty, roll the dice, hope that a release doesn't happen, and if it does, then you can assert BFPP status as a defense in a suit against New Jersey. This Court's, the two cases, the two most important cases about BFPP status and PRP owner liability that this Court has decided are Litgo and Traynor. Those two cases made clear that the current owner of a site is strictly liable for all current and past response costs of a state. So CERCLA set up this strict liability scheme. There are potential limits on PRP liability. One of those is proving BFPP status by a preponderance of the evidence. But precisely because they... But if we interpret, we endorse what the District Court did here with disposal, a remediator can never succeed on BFPP because they're always going to be deemed to violate disposal as soon as the backhoe hits the ground. That's not the case, Your Honor. That's not the case. It wasn't just the puncturing of the tank, as the District Court said. It was also the stockpiling of that contaminated soil on site. That would be appropriate. The reburying of that contaminated soil. But that would violate other provisions, namely appropriate care, right? Not necessarily. As I read the District Court's opinion, and correct me, maybe I'm misreading it, but as I understand that opinion, the District Court said that the minute the tank, UST, was punctured, they violated the disposal requirement. I don't read the District Court opinion that clearly. On page 14, they say, after the discharge, they excavated it and stockpiled it at the site. The next sentence says the soil was mixed with non-contaminated soil, used as fill in various places. And I didn't see that the District Court pinpointed precisely which of those actions or whether those actions collectively constituted disposal. All right. So maybe taking it and moving it into the berm, et cetera, that would have been a new disposal? If they just punctured the tank and then called in NJDEP and said, you know, what do we do, then maybe they're not a disposer? Is that what you're saying? Correct. And we would say that. There are easier, if the court is going to reach the BFPP, Well, it might, no, I don't want to belabor this anymore, but one last question on it. If we don't need to reach it, why did the District Court reach it? And why didn't you tell the District Court, or maybe you did, say, you know, look, this is a non-issue. If the government's correct, this is a 113 case, not a 107 case, and it's time-barred, stop. I believe we made that point clear in our District Court briefing. The District Court chose to reach it. This court can uphold the judgment of the District Court without reaching that issue because the only claim they have is a contribution claim, and it's time-barred. I'm sorry I don't have any insight into why the District Court chose to reach that issue. But you did make the same argument there that you're making here on that, that it was unnecessary. Right, but that issue would only arise as an alternative if you lost on the 113 time-barred. If you determine that they have a 107 claim, then our contribution counterclaim comes into play, and we think that the undisputed facts demonstrate that they're a liable party, not just on the disposal issue but on the three other criteria that we briefed below and on appeal. But if this panel does reach the issue, does determine that a 107A claim is appropriate, and disagrees with the government that the undisputed facts demonstrate that they don't prove VIPP status, the correct action in that case would be to remand that question of fact to the District Court. Counselor, so we've treated 113F and 107A as exclusive in this context, but if a PRP can waive its 113 defense to contribution and thus become able to make a 107 claim, I don't understand whether that's at its option or whether they're just stuck in 113 land, and whether that matters as a practical matter. That's an interesting question. So whether they can waive a defense available to them by statute is not an issue that we briefed here or that anyone has argued here, and the settlement language is very clear that that defense remains available to them. So I think that we're happy to submit additional briefing on whether waiver is a possibility and what would happen. You're aware of any? I'm not aware of any case where that would happen, because that's precisely why you would enter into one of these settlements, is to protect yourself from a contribution counterclaim. Unless there are any further questions, we ask that the judgment of the District Court be affirmed. Okay. Thank you, Mr. Kupfer. We'll hear Mr. McGarren's rebuttal. If you don't mind, Mr. McGarren, would you begin with the question, why nine years, if you can share? Yes, Your Honor, I'll begin with that. This cleanup originally was estimated to cost somewhere on the order of $8 million, and a munitions cleanup is very different than a chemical cleanup, because you're basically looking for hairpins all over the place, and it requires screening through remote methods and then actual excavation. So what happened here is that the course of the investigation and cleanup, which were done in tandem, resulted in much wider areas of impacted property, which led to significantly increased costs, and the cleanup costs here well exceed $50 million at this point. And in terms of why it took nine years, my client believes that it is exempt from liability. That's the whole reason it entered into this arrangement here, because it thought it was protected by Congress from liability, and therefore would have a 107 claim, which is a much more potent claim, and the claim that you would choose to use, because it has significant impacts on the burden of proof once you establish liability. The innocent party is entitled to joint and several liability, as opposed to several liability where you have to prove the share of the party. Here, the United States created all of the munitions contamination, but that's a significant factor in these types of cases. In response to Judge Bibas's question and Judge Greenaway's question. I'm sorry. Let me just finish up that thought. And you bought it in 05 or 06? Is that right, your client? 06, Your Honor. Okay. Maybe not coincidentally, Atlantic Research was decided in 07. Yes, Your Honor. Which really, I guess, changed the landscape here, right? I mean, that was a landmark decision regarding the interrelationship or lack thereof between 107 and 113, right? It certainly was a landmark decision, Your Honor, but what triggered the actual acquisition of this site was the 2002 amendments to the statute and the BFPP status. That's critical to a brownfield redevelopment. Okay. But it sure sounds like, based on everything you're telling us, at the time your client acquired the property, they were operating under the belief that they would be able to pursue a 107 cost recovery action  Correct, Your Honor. Judge Greenaway and Judge Bevis, I'd refer you to page 25 of our opening brief, where we described how we responded to the N26, to the release that was addressed by the district court, which I agree with Judge Hardiman, seems to be the sole reason the release of 20 gallons of material during the cleanup, why the court did not find my client had BFPP status. But we talked about how we punctured the tank, the contractor punctured the tank, immediately reported the discovery to DEP, immediately excavated soil, consulted with the DEP hotline on how to deal with this, and the material was screened for munitions and then deposited under a cap at the site. And that section of the brief also refers to the undisputed statement of fact below, which was addressed. I'd like to take some time to address the third issue on appeal here, which is if the court finds that my client is relegated to a 113 F3B claim, is the claim tied by the three-year statute of limitations? And there's a lot of law on this subject going in different directions. But the 113 G3, which is the statute that applies to the three-year contribution type claim, statute of limitations, enumerates four very specific triggers, none of which exist here. A judgment by court, which is where someone pursues a party and gets a judgment that they're responsible for costs. An administrative order under section 9622G, which is a de minimis settlement, again, where a de minimis party pays costs, reimburses costs. An administrative settlement under 9622H, which is a cost recovery settlement, indeed, again, where reimbursement is made for costs that the party can make. The government's conceded the point. It's not listed there. Right. This is not listed. But you're not arguing that there's no statute of limitations, right? You agree that would be absurd to say there's no statute of limitations. Yes, Your Honor. So isn't the normal course to borrow the most closely applicable statute of limitations? Why is the six-year period for judicially approved settlements not the closest analog here? Because this wasn't a judicially approved settlement. It wasn't. What's a closer analog than that? The action itself, the cleanup action itself that was performed here, which took nine years because it took nine years to investigate where all the munitions were. Is there a nine-year period or a ten-year period anywhere in the law that we would borrow? I don't see it. Well, in the course of that nine years, the trigger for when the client was able to actually initiate the remedial action occurred, which didn't occur until 2013. We were not able to go out and initiate the remedial action until we had approval of the remedial action work plan by the department and until we had the permits, because you can't go out and just do a remediation in New Jersey without permits. What is it that we're consulting to come to the conclusion that the triggering event should be the remedial action for the six-year statute? The remedial action work plan is the document that was approved by the department that provided for what the remedial action was, not a removal action, what the remedial action was and how it will be implemented. And once that was approved, the client was then able to go and get permits, land-use permits, et cetera, in order to actually do the cleanup, which took time. I'm so sorry. I must not have articulated the question I wanted answered. My question is, if the remedial action, in your view, is the triggering event for the running of the statute of limitations, where would we go to to find that? That's the question that we're grappling with. You say the six-year statute of limitations applies, and you say that it hasn't run, that you brought the action in sufficient time. Your adversary says no, way out of luck. And I'm trying to draw the nexus between your reference to the remedial action and the beginning or starting of the statute of limitations, because at the moment I don't see it. It would commence with on-site construction of the remedial action. I think what my brother is trying to ask is, what is your toehold in the law that points us to the commencement of the remedial action? I see that for cost recovery actions in G2, but I don't see anything in G3 for contribution actions that suggests that the right time is for the commencement of the remedial action, not for, say, the date of a judgment or the date of a settlement. What in the law supports your assertion? Maybe that's not what Judge Greenaway is asking. No, that's it. I accept. Supports my assertion. Supports your assertion that this is the right triggering date. I think that's what we're getting at. We're grappling with that, yes. A toehold is not something I'd use, but okay. Well, it's clear with respect to the types of triggers in 113 G3 when it starts. It's from the date of the administrative settlement, judgment, or consent decree. In terms of the remedial action. We just went back to square one and we're nowhere, right? We all agree that that doesn't say that administrative settlement like this one is a trigger. We're trying to find out what the trigger is, if you could help us. And I guess I heard you say the cleanup is the trigger. It's on-site, initiation of on-site construction. On what day and what day? There's a document in the record in 2013 when the permits were approved that allowed the on-site construction to start. I'll take that, except now tell me what in the law says I should use that date. Well, the cases that address on-site construction, it could be the construction of a fence as part of the remedial action. Here, I would submit, Your Honor, that it couldn't have started before 2013. Because you didn't have the permits. You didn't have the permits. It's really a tolling argument is what it is. You're saying we couldn't get going until we got the permits, so don't hold all that passage of time against us until the date that we got the permits. We couldn't lawfully start the cleanup in the state of New Jersey, Your Honor. That's the simple answer. So you're making an equitable tolling claim. No, I'm making a specific argument that the initiation of on-site construction did not happen before the permits were approved in 2013. And it did not. All right. Thank you, Mr. McGarren. Thank you, Your Honor. Thank you, Mr. Kupfer. We appreciate the helpful arguments. We'll take the matter under review.